NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0152n.06

No. 14-1012

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Feb 25, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WILLIAM ROGER DEKEYZER, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| SHIRLEE HARRY, Warden, | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF MICHIGAN |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE: BATCHELDER and ROGERS, Circuit Judges; BECKWITH, District Judge[*]

ALICE M. BATCHELDER, Circuit Judge. Petitioner William Roger Dekeyzer appeals the denial of habeas relief from his Michigan convictions on three counts of criminal sexual conduct. The district court granted a certificate of appealability as to the determinations of the Michigan Court of Appeals that allegedly perjured testimony would not have affected the outcome of his trial, and that his trial counsel was not ineffective for failing to investigate the alleged perjury. We affirm.

**I.**

In 2006, a grand jury in St. Clair County, Michigan, indicted Petitioner on one count of criminal sexual conduct in the first degree (sexual penetration of a person under thirteen years of

---

[*]The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

age) and two counts of criminal sexual conduct in the second degree (sexual contact with a person under the age of thirteen). The charges arose from allegations that Petitioner engaged in sexual activity with his underage granddaughter, C.C., in 2004 and 2005, while C.C. stayed with Petitioner and his wife in Harsens Island, Michigan. At trial, a jury considered the testimony of many witnesses. Their testimony is summarized here.

Sergeant Graham Rummel of the Clay Township Police Department testified that he launched an investigation into Petitioner after he received a report from Child Protective Services in February 2006 about C.C.'s situation. At that time, he spoke with Tracy Cook— C.C.'s mother and Petitioner's daughter—and Petitioner—C.C.'s grandfather—regarding the allegations. He arranged for an interview of C.C.

Tracy Cook testified that, although her daughter had previously enjoyed visiting her grandfather, something changed in the summer of 2004. Specifically, C.C., about nine-years-old at the time, complained that "grandpa was hugging her and rubbing her back" and "his hands were traveling down around her rear and she was very uncomfortable with that." Cook assumed her daughter was merely apprehensive about her body's changing during puberty, but she nonetheless asked Petitioner to hug his granddaughter in a more appropriate manner. Although Cook believed this conversation had settled the situation, C.C. still seemed nervous about visiting Petitioner in the fall of 2004. Finally, in the summer of 2005, C.C. divulged the alleged abuse to Cook. Cook confronted Petitioner and his wife (Cook's mother), telling them that her children would no longer visit Petitioner's home. But Cook did not meet with the police until early 2006, and then only after Sergeant Rummel had contacted her. After talking with the police, Cook drafted a statement that formed the basis of the allegations against Petitioner, a statement that C.C. signed without reading.

Most notably for this case, on cross-examination Cook testified that she had taken her daughter to a family doctor, Dr. Faremouth, following the alleged abuse. She alleged that Dr. Faremouth never performed an examination on C.C. because "even if there was any sort of penetration, [] it wouldn't show up."

Cheryl Johnson, C.C.'s aunt and Petitioner's other daughter, testified that Petitioner had molested her as a child. She estimated that when she was between the ages of six and sixteen, Petitioner molested her three or four times a week, which, as the defense highlighted, is a total of almost two thousand times. Specifically, she testified that Petitioner touched her breasts, put his fingers in her vagina, attempted to insert his penis into her vagina, performed oral sex on her, and forced her to perform oral sex on him. She never told anyone outside the family or contacted the police at the time because she "honestly thought that's how your parents taught about sex ed." She did, however, show her mother a tear in her vaginal area when she was thirteen years old. And she told the jury that when she confronted Petitioner about the molestation years later, he replied, "When you walk around in a bikini what am I supposed to do?" Finally, she testified that in late summer 2005, C.C. confided in her about being molested by Petitioner, and that she convinced C.C. to tell Cook.

On the second day of trial, a now-twelve-year-old C.C. testified that, starting in 2004, her grandfather would hug her and make her feel uncomfortable. The contact escalated until he began to touch her in her "private areas." On a picture of a girl provided by the prosecution, she circled the genital area as what she was referring to when she said "private areas." Specifically, she testified that her grandfather's finger went in between the folds of skin in her genital area. The prosecution rested after C.C.'s testimony.

The defense called several witnesses to attack the credibility of Cook and Johnson. Michael D'Anniballe testified that he had been engaged to Johnson between 2003 and 2005. He did not consider Johnson to be a truthful person and was "very, very skeptical" about Johnson's story concerning the sexual encounters with her father, which she had told him on their first date. Despite the supposed sexual encounters, he never noticed any strain in the relationship between Johnson and her parents.

Diane Dekeyzer—Petitioner's wife and Cook and Johnson's mother—testified that she never noticed her husband acting improperly with any of their children. She also never noticed anything strange in the interaction between C.C. and her husband. She and her husband removed Cook and Johnson from their estate arrangements after their daughters lodged these allegations against Petitioner. Finally, she testified that, when confronted by Johnson about the alleged molestation while Johnson was a child, she believed her husband because Johnson "would tend to look for attention."

Ronald Dekeyzer, Petitioner's son and the brother of Johnson and Cook, testified that he had never witnessed any sexual contact between Petitioner and Johnson while he lived in the same house. He also never saw anything inappropriate happen between Petitioner and C.C. at various family functions. He testified that Johnson is "deceitful" and "manipulative," and Cook has a reputation for being "kind of like the island B word." In late fall or early winter of 2005, he informed Johnson that she and Cook were no longer beneficiaries of their parents' trust.

Finally, Petitioner took the stand in his own defense. He denied all the allegations against him, both those lodged by Johnson and those lodged by C.C. After Petitioner's testimony, the defense rested.

The next day, the jury found Petitioner guilty as charged on all three counts. The trial court sentenced him to imprisonment of eighty-one months to thirty years for the first-degree criminal sexual conduct conviction and a concurrent term of nineteen months to fifteen years for the two second-degree criminal sexual conduct convictions.

After he was sentenced, Petitioner obtained an affidavit from the Cook family doctor, Dr. Faremouth, stating that the doctor had never discussed any sexual abuse with Cook. Petitioner filed a motion in the trial court for a new trial, claiming that he had new evidence that Cook had committed perjury at his trial when she testified that she had taken C.C. to see Dr. Faremouth. The trial court, after hearing oral argument on the motion, ruled that Petitioner's affidavit did not warrant a new trial because it would not produce a different result in the case.

Petitioner appealed his conviction and the Michigan Court of Appeals, in an unpublished, per curiam opinion, affirmed his convictions. *People v. Dekeyzer*, No. 281207, 2009 WL 2477617 (Mich. Ct. App. Aug. 13, 2009). The Michigan Supreme Court summarily denied leave to appeal further. *People v. Dekeyzer*, 780 N.W.2d 805 (Mich. 2010). Petitioner then filed a motion for reconsideration of the denial of his appeal, which the Michigan Supreme Court also denied. *People v. Dekeyzer*, 784 N.W.2d 210 (Mich. 2010).

In 2011, Petitioner filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising three grounds for relief: 1) that the Michigan Court of Appeals violated his due process rights by failing to overturn his conviction when the conviction was obtained through the use of perjured testimony; 2) that the Michigan Court of Appeals improperly applied federal law in finding that his trial counsel was not ineffective; and 3) that the Michigan Courts denied his right to a fair trial and his right to remain silent by permitting the admission of prior bad-acts evidence. The district court denied the petition but granted a certificate of appealability on

Petitioner's perjury claim and the related claim about trial counsel's failure to object to or investigate the alleged perjury. Petitioner appeals on those two grounds.

## II.

We review de novo a district court's legal conclusions and mixed questions of law and fact, and review its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may not grant a habeas petition with respect to any claim that was adjudicated on the merits in the state courts unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court reaches a decision different from that of the Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Id.* An unreasonable application, however, is different from an incorrect application. *Id.* at 410.

To obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). This standard, the Supreme Court recently reminded us, is "difficult to meet." *White v. Woodall*, 134 S. Ct. 1697, 1702

(2014) (quoting *Metrish v. Lancaster*, 133 S. Ct. 1781, 1786 (2013)) (internal quotation marks omitted). Further, in the context of ineffective-assistance-of-counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court has stated that if AEDPA review is a difficult standard to meet, "that is because it was meant to be." *Harrington*, 562 U.S. at 102. "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential and when the two apply in tandem, review is doubly so." *Id.* at 105 (internal citations and quotation marks omitted). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable"; instead, "[t]he question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## A.

Petitioner first contends that the Michigan Court of Appeals unreasonably applied clearly established federal law by denying relief on his claim that his conviction was obtained through Cook's alleged perjury. Petitioner claims that leading up to trial, there was no indication that Cook had taken C.C. to a doctor. Both sides mentioned during their opening statements that the jury would not hear from a doctor or see any medical evidence. During the defense's cross-examination of Cook, however, she said that she had taken C.C. to the family doctor following the alleged abuse, but that the doctor did not perform a physical examination because digital penetration would not have left any evidence. Defense counsel did not press Cook on the issue or investigate the truthfulness of this testimony. In her closing argument, the prosecutor made several references to the alleged doctor visit, essentially bolstering Cook's testimony by observing that she made the correct choice in taking C.C. to a doctor but that the visit did not produce any tangible evidence for purposes of this case.

Petitioner argues that the subsequent affidavit from the family doctor, which reveals that Cook never talked with him about any sexual abuse of C.C., proves that Cook perjured herself and thus the prosecution's references to the doctor visit resulted in a conviction based on perjured testimony in violation of his constitutional rights. The Michigan Court of Appeals rejected this argument, holding that "there is no reason to believe that informing the jury about the perjury would make a different result more probable." *Dekeyzer*, 2009 WL 2477617 at \*4.

The Supreme Court "has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Agurs*, 427 U.S. 97, 103 (1976) (footnote omitted). Similarly, "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* Distilling these precedents, we have allowed a habeas petitioner to prevail on a perjured-testimony claim if he shows: "(1) that the prosecution presented false testimony (2) that the prosecution knew was false, and (3) that was material." *Akrawi v. Booker*, 572 F.3d 252, 265 (6th Cir. 2009) (internal quotation marks omitted). The district court held that Petitioner's argument failed all three prongs of the *Akrawi* test.

Our review of this claim is significantly constrained by AEDPA. We must simply determine whether, by finding that Cook's testimony would not have affected the judgment of the jury, the Michigan Court of Appeals unreasonably applied *Agurs* and *Napue*. We cannot say that it did. Although Petitioner attempts to frame the trial as a credibility contest between himself and Cook, thus increasing the significance of Cook's testimony, it is at least reasonable,

if not likely, that the jury instead saw it as a credibility contest between Petitioner and C.C. If that were the case, even if the jury had known that C.C.'s mother lied on the stand, it could have convicted Petitioner solely on C.C.'s testimony. In fact, the prosecution contended in its closing argument that C.C.'s testimony was all it needed for a conviction. The Michigan Court of Appeals, therefore, did not unreasonably determine that, despite Cook's lie, the jury convicted Petitioner simply because it believed the nine-year-old child who detailed various sexual acts her grandfather had perpetrated on her and that there was not a reasonable likelihood that the jury premised its conviction on Cook's lie.

**B.**

Petitioner next contends that the Michigan Court of Appeals unreasonably applied *Strickland*, when it determined that he had the effective assistance of counsel despite his trial counsel's failure to object to or investigate the alleged perjury. *See Dekeyzer*, 2009 WL 2477617 at \*4. In *Strickland*, the Supreme Court outlined the two-prong test for a claim of ineffective assistance of counsel:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

466 U.S. at 687. Although the district court held that the Michigan Court of Appeals's determination was not unreasonable under either the deficient performance or prejudice prong, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Id.* at 697. "If it is

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Id.*

To prove prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. As we have already explained, the Michigan Court of Appeals was not unreasonable in determining that Petitioner could not show that the result of the proceeding would have been any different even absent the alleged perjury, because the jury could have seen the trial as a credibility contest between Petitioner and C.C., not Petitioner and Cook. And although AEDPA accords our review of the prejudice prong of a perjury claim only one layer of deference, it accords two such layers to our review of an ineffective-assistance-of-counsel claim. This doubly deferential standard of review requires that we determine only whether there is any reasonable argument that *Strickland*'s deferential standard was satisfied. *Harrington*, 562 U.S. at 105. Clearly there is.

## III.

For the foregoing reasons, we AFFIRM the judgment of the district court.