NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 10a0542n.06

No. 08-2167

**FILED**
**Aug 23, 2010**
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

KENNETH ANDREW JEFFERSON,

    Petitioner-Appellant,

        v.

UNITED STATES OF AMERICA,

    Respondent-Appellee.

On Appeal from the United
States District Court for the
Eastern District of Michigan
at Detroit

_____/

**Before:**    **GUY, BOGGS, and SUTTON, Circuit Judges.**

    **RALPH B. GUY, JR., Circuit Judge.**    Petitioner Kenneth Andrew Jefferson, a federal prisoner, appeals from the dismissal of his § 2255 motion and his supplemental motions as barred by the one-year statute of limitations. Petitioner argues that some of his claims were filed timely under 28 U.S.C. § 2255(f), or should benefit from equitable tolling, and seeks remand for determination on the merits or, at least, for an evidentiary hearing on the statute of limitations. Jefferson relies on his claim that the prosecutor in his case, Richard Convertino, withheld information regarding the full extent of the agreements he had with cooperating witnesses, let them testify without disclosing the information, and used a "strategy" of making oral motions for reduction of sentence and sealing the records to

conceal the information. Jefferson also argues that he was denied effective assistance of counsel by counsel's failure to obtain a transcript of cooperating witness Labron Nunn's testimony from a prior trial to use for impeachment purposes. After review of the record and the arguments presented on appeal, we reverse and remand for further consideration of the statute of limitations and the possible application of equitable tolling.

## I.

In June 1999, after a lengthy jury trial, Jefferson was convicted, along with codefendants Joseph Stines, Keith Phelan, Durand Ford, Antonio James, Aaron Bowles, and David Bowles, of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base in violation of 21 U.S.C. §§ 841 and 846. The conspiracy was alleged to have involved drug distribution in the Ypsilanti area between 1989 and September 1998. The district court determined after a sentencing hearing that Jefferson was responsible for more than three kilograms of crack cocaine. Ultimately, the district court sentenced Jefferson to a term of 240 months—the maximum penalty for an unspecified quantity of any form of cocaine under 21 U.S.C. § 841(b)(1)(C).

Jefferson appealed, and this court affirmed his conviction (as well as the convictions of Stines, Ford, and Phelan) in *United States v. Stines*, 313 F.3d 912 (6th Cir. 2002). Jefferson's three other codefendants cooperated in exchange for reduced sentences. Some background concerning the evidence is helpful in evaluating the issues raised in this appeal. As we summarized in *Stines*:

The voluminous testimony and other evidence introduced at trial established the following facts. In the late 1980's Joseph Stines organized a gang in Ypsilanti, Michigan, to "distribute crack cocaine and make money." The initial members included Keith Phelan, Tever Scarbrough, Reese Palmer, Rasual Warren, Hans Thomas and Stanley Anderson. Stines and Palmer learned to measure, package and "rock up" crack cocaine in 1989. Together with Hans Thomas, they obtained large quantities of cocaine from LaBaron Hunter and other sources in Detroit and brought it back to Ypsilanti to be processed and distributed.

During the early years, Stines sold directly to customers, sometimes out of a parked car. Stines was arrested in June 1989 for selling crack on the street. By 1993, Stines considered himself a "drug kingpin," and he divided up and assigned territory to other members.

In May 1995, Oscar Little, an acquaintance of Stines, agreed to cooperate with the police. Little purchased one ounce of crack directly from Stines at an apartment on Elmwood. The purchase and other information supplied by Little provided probable cause to search the apartment on Elmwood and Stines's apartment on Spinnacker Way. . . . Stines was arrested after the search and he offered to cooperate with the police. He told Lieutenant Donald Bailey that he was buying ten to fifteen kilograms of cocaine from LaBaron Hunter every couple of weeks. Bailey released Stines, hoping to use him to investigate Hunter, but Stines did not cooperate.

Rasual Warren, one of the original gang members, was released from a rehabilitation program in July 1996. Phelan directed Warren to JJ's Car Wash when he asked about Stines. Stines introduced Durand Ford as his "right hand man" and Phelan as his "enforcer." Initially, Stines said that he wasn't in the drug business any more, then said he still sells but "keeps it in the Stone Life [gang] circle." Stines assigned Warren to sell crack on Grove Street, but he was later moved to make room for Palmer. . . .

After Palmer was released from prison in September 1996, he chose Grove Street as his territory. . . . Palmer made several sales to [an undercover officer] in October and November 1996. Palmer was arrested based on those sales. He agreed to cooperate with the police and taped a conversation with Stines during which Stines talked about tactics to evade police by revealing that he did not "go outside the circle," and he had Ford deal with everyone else. After Palmer bought crack from him, Stines left in a car driven by Ford.

Police managed to make a series of undercover crack purchases from Scarbrough in July 1997. Scarbrough arrived for the third meeting in a car registered to Kenneth Jefferson. After Scarbrough was arrested, he allowed police to record a conversation with Stines that provided police with Stines's Doral Street address. Scarbrough also bought an ounce of crack from Stines while police surveilled from a distance. Two days later, Scarbrough met Stines outside a store to pay for the crack. While they talked in the car, Phelan took some other men who had accompanied them into the store.

Later that same year, Jefferson sold Labron Nunn two and a half ounces of crack. Jefferson obtained the crack for the sale from Anita Hargrove's home, where he was staying. Hargrove was Stines's girlfriend and he used her apartment as a "stash house." Jefferson asked Nunn to join "the family," but Nunn declined.

*Id*. at 914-15. Significant to this court's rejection of Jefferson's challenge to the sufficiency of the evidence was that:

When Jefferson was subsequently arrested, he admitted that he had started selling crack in Ypsilanti in the summer of 1996. He said that Scarbrough was one of his principal suppliers and that he often bought one-eighth of a kilogram, but on two occasions he had purchased a half kilogram.

*Id*. at 915.[1] In addition, this court noted Nunn's testimony that the crack cocaine he purchased from Jefferson had been stored at Stines's girlfriend's house. The court also found no basis to disregard the testimony of Samuel Mullice that in 1996 he met Jefferson at their parole office, and Jefferson gave him a business card and invited him to call if he wanted to "do something." Mullice testified that he understood this to mean selling drugs, although that was not stated.

---

[1]The government adds that Jefferson also admitted distributing drugs with Stines and being present while Stines was "cooking" crack. That portion of his post-arrest statement was not admitted at trial because of *Bruton* concerns, but was reviewed by the district court prior to sentencing. *Bruton v. United States*, 391 U.S. 123 (1968).

Although there was some question in the district court about when Jefferson's conviction became final for purposes of § 2255(f)(1), the district court examined the evidence *de novo* and found that Jefferson was not actually a party to the petition for writ of certiorari that was filed only on behalf of Stines. Jefferson also argued that he reasonably believed the petition had included him, but now concedes on appeal that his conviction became final on May 12, 2003, upon the expiration of the 90-day period for seeking the writ. *Jimenez v. Quarterman*, 555 U.S. __, 129 S. Ct. 681, 685 (2009); *Clay v. United States*, 537 U.S. 522, 525 (2003). Thus, Jefferson's § 2255 motion, filed on August 26, 2004, was not filed within one year of the date on which the conviction became final. Nor does Jefferson pursue any of the claims raised in the initial § 2255 motion.[2]

Rather, Jefferson argues that it was error to dismiss as untimely the new claims he raised in two *pro se* motions filed on March 25, 2005, and supplemented through his joinder in the Supplemental Brief filed by Stines in June 2006. First, Jefferson's Amended Motion for New Trial or Renewed Mistrial, which adopted for a second time the motion for new trial filed by Stines in June 2000, alleged that: (1) the prosecutor withheld information regarding additional deals with cooperating witnesses; (2) other cooperating witnesses had admitted giving false testimony; and (3) one witness was threatened into not giving exculpatory evidence. Second, Jefferson's Motion to Recall the Mandate or for Relief under Rule

---

[2]The initial § 2255 motion alleged: (1) a *Booker*-based sentencing challenge; (2) error in relying on new evidence at the sentencing hearing to determine the type and quantity of drugs involved; (3) ineffective assistance of counsel for failing to inform him of a plea offer; and (4) that his sentence exceeded the statutory maximum. *United States v. Booker*, 543 U.S. 220 (2005).

60(b)(5) asserted one new claim, that Labron Nunn, described as a "professional standby witness" for this prosecutor, implicated Jefferson at trial through testimony that conflicted with Nunn's prior testimony in an unrelated drug case six months earlier.

In August 2005, the magistrate judge recommended that Jefferson's March 2005 motions be denied as untimely because they asserted new claims that would not "relate back" to what the magistrate judge assumed to be a timely § 2255 motion. In August 2008, the district court rejected the recommendation in an order that also addressed the motions of Ford and Phelan. In that order, the district court found, *inter alia*, that because Jefferson had not joined in the petition for certiorari filed on behalf of Stines, there was no timely § 2255 motion to which the new claims could arguably "relate back." The district court also rejected Jefferson's alternative contention that the claims raised in the March 2005 motions were timely because they were filed within one year of "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). Finally, despite Jefferson's arguments for equitable tolling, the district court did not address the issue.

Jefferson was not the first or the only defendant in this case to raise similar claims of prosecutorial misconduct. Ford and Phelan, however, did not do so until after their § 2255 motions had already been decided. As a result, in the same order that dismissed Jefferson's claims, the post-judgment motions of Ford and Phelan were transferred to this court and brief orders were entered denying leave to file second or successive § 2255 motions. Stines, on

the other hand, raised his claims in a timely § 2255 motion that remains pending in the

district court.

Jefferson appealed, and the district court granted his motion for certificate of

appealability in a one-line order. The government does not argue that the certificate of

appealability was defective because it did not assess the merits. *Slack v. McDaniel*, 529 U.S.

473, 484 (2000); *Porterfield v. Bell*, 258 F.3d 484, 486 (2001). Nor does the government ask

that we bypass the timeliness issue and deny the claims on the merits. *See Pough v. United

States*, 442 F.3d 959, 965-66 (6th Cir. 2006). For these reasons, we confine our review to

the dismissal on statute of limitations grounds.

## II.

### A.    One-Year Limitations Period

The one-year limitations period applicable to a § 2255 motion runs from the latest

of—

> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f)(1)-(4). Jefferson concedes that his claims are not timely under § 2255(f)(1), and his argument that the new claims were timely under § 2255(f)(2) was not presented to the district court in the first instance. This leaves Jefferson's contention that the new claims asserted in March 2005 were timely under § 2255(f)(4).

Jefferson argues that the facts supporting the claims could not have been discovered until either: (1) September 2, 2004, with the dismissal of the terrorism charge in *United States v. Koubriti*, 336 F. Supp. 2d 676 (E.D. Mich. 2004), because the same prosecutor who tried Jefferson's case, Richard Convertino, failed to disclose exculpatory and impeachment evidence in that case; or (2) September 30, 2005, when the government disclosed letters written by cooperating witnesses Hans Thomas, Tali Alexander, and Rasual Warren as part of an investigation into Convertino's possible unauthorized downward departures for these and other cooperating witnesses. The district court summarily rejected both arguments because *Koubriti* involved conduct in a separate unrelated case and the government's disclosures in September 2005 came *after* Jefferson filed his March 2005 motions.

We agree with the district court that nothing in the *Koubriti* decision would provide a factual predicate for Jefferson's claims; the fact that *Koubriti* involved the same prosecutor is not sufficient. Nor can Jefferson logically argue that he did not discover the facts supporting the claims presented in the March 2005 motions until after the government's disclosures in September 2005. Rejection of this proposition, however, did not resolve the critical question of whether Jefferson's additional claims were brought within one year of

"the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). Because there are no factual findings in this regard, we remand for further consideration of the statute of limitations issue.

It appears that there was suspicion at trial that at least one cooperating witness had been promised more than was being disclosed. Counsel for Ford asked Hans Thomas whether it was "conceivable" that he could be "out" in five years. Convertino objected, emphasizing that Thomas faced a mandatory minimum of ten years, and then solicited from Thomas an estimate that his likely sentence would be 15 to 23 years. Thomas (like other cooperating witnesses) was not sentenced until after trial, however, and the judgment and other sentencing records were sealed.

In the motion for new trial filed by Stines in June 2000 (and joined in by Jefferson), it was asserted that the government must have withheld information concerning the extent of the cooperation agreement with Reese Palmer because Palmer was released shortly after the trial. It was also alleged that Palmer, Alexander, and Warren had conspired to give false testimony. This motion for new trial was not decided on the merits, but was denied because of the pending appeal. When these claims were raised again on direct appeal from the judgment of conviction, this court found that it was without jurisdiction to decide them because no separate appeal had been filed from the denial of the new-trial motion. The rest of the alleged pattern of hidden deals for cooperating witnesses was revealed over time.

For example, Stines learned that Thomas had been arrested for a 2002 murder when he should still have been serving his sentence under the plea agreement. Exactly when this occurred is not clear from the record. Nevertheless, once it was discovered, counsel for Stines started digging. When the records of Thomas's sentencing were unsealed, it was discovered that Thomas was sentenced to a 6-year term of imprisonment based on an oral motion for downward departure. A year later, on the grounds of additional cooperation and a Rule 35(b) motion, Thomas's sentence was reduced to "time served." Thomas would later admit in the letter to investigators, which was among those disclosed in September 2005, that Convertino had assured Thomas that he would "do much better" in the end than the plea agreement reflected.

Counsel for Stines began looking further into the sealed sentencing records of other cooperating witnesses, including Alexander, Palmer, Reed, Warren, Mullice, Little, and Nunn. The effort met with some resistance and it is not immediately apparent how quickly this investigation proceeded; except that counsel for Stines was still filing motions to unseal records at the end of 2005. Also, a stipulation was entered allowing Stines additional time to amend his § 2255 motion because of the difficulty in gathering the necessary materials.

We cannot ignore that it was in March 2004, one year before Jefferson's motions were filed, that Alexander wrote to his sentencing judge seeking assurance that he would get the additional reduction in his sentence that he claimed to have been promised by Convertino. That letter, turned over to the United States Attorney's Office, prompted an investigation into

various sentencing departures requested by Convertino on behalf of defendants in *United States v. Alexander, et al.*, seven of whom testified for the government in this case. That investigation led to the disclosures in September 2005, and culminated with the completion of the "Schools Memorandum" in January 2006. Without recounting the information set forth in that Memorandum, we note that it suggests there is evidence that Convertino met with some cooperating witnesses in this case without defense counsel; entered written plea agreements and made some, at least tacit, promises of further sentencing reductions; had witnesses testify without revealing the additional understandings; moved orally at sentencing or in Rule 35 motions for downward departures; and had the sentencing records of these witnesses sealed. The fairness of Jefferson's trial was not the focus of the investigation, but it produced evidence that the government felt compelled to disclose to Jefferson. Stines filed his amended § 2255 motion in March 2006, and his Supplemental Brief in June 2006. Jefferson, through counsel appointed in January 2006, filed a Joinder in the Supplemental Brief in September 2006.

The district court did not make a finding, and it is not clear from the record, as to whether Jefferson brought these claims within one year of the date on which the facts supporting them could have been discovered through the exercise of due diligence.

## B.     Equitable Tolling

Jefferson argued, in the alternative, that equitable tolling should apply to avoid the bar of the statute of limitations with respect to the claims raised in his March 2005 motions. This

court has held that the one-year statute of limitations is not jurisdictional and may be tolled when the petitioner demonstrates "'(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). We have also cautioned that "equitable tolling should be granted sparingly." *Solomon v. United States*, 467 F.3d 928, 933 (6th Cir. 2006) (citing *Dunlap v. United States*, 250 F.3d 1001, 1008-09 (6th Cir. 2001)). A district court's decision on the issue of equitable tolling is reviewed *de novo* when the facts are undisputed. *Id*. at 932.

In determining whether to apply equitable tolling, the following factors are considered: "(1) the petitioner's lack of notice of the filing requirement; (2) the petitioner's lack of constructive knowledge of the filing requirement; (3) diligence in pursuing one's rights; (4) absence of prejudice to the respondent; and (5) the petitioner's reasonableness in remaining ignorant of the legal requirement for filing his claim." *Solomon*, 467 F.3d at 933 (citing *Dunlap*, 250 F.3d at 1008). These factors are not necessarily comprehensive, nor is each factor relevant in every case. *Id*.; *see also King v. Bell*, 378 F.3d 550, 553 (6th Cir. 2004). When the petitioner does not claim ignorance of the filing requirement, the focus of the inquiry is on his diligence and the reasonableness of his ignorance of the effect of his delay. *King*, 378 F.3d at 553.

Jefferson argues that he diligently pursued his claims, but did not have access to the facts to support his allegations because the prosecutor's conduct concealed the facts that

supported his claims of prosecutorial misconduct. Jefferson raised equitable tolling in opposing dismissal on statute of limitations grounds, but the district court did not address the issue in dismissing Jefferson's claims as untimely. Accordingly, we remand for the district court to consider in the first instance whether to apply equitable tolling to permit Jefferson to pursue the claims raised in his March 2005 motions.

Accordingly, we **REVERSE** the dismissal of Jefferson's § 2255 motion and **REMAND** for further consideration of the statute of limitations and the applicability of equitable tolling.