RECOMMENDED FOR PARTIAL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0413P (6th Cir.)
File Name: 02a0413p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
       *Plaintiff-Appellee,*

    *v.*

JOSEPH ROVESS STINES
(00-1222); DURAND
CHAUNCE FORD (00-1594);
KEITH MAURICE PHELAN
(01-1119); KENNETH
ANDREW JEFFERSON (01-
1179),
       *Defendants-Appellants.*

Nos. 00-1222,
00-1594; 01-1119,
01-1179

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 98-80812—Paul D. Borman, District Judge.

Argued: June 13, 2002

Decided and Filed: December 3, 2002

Before: SILER and MOORE, Circuit Judges; STAFFORD,
District Judge.[*]

_____

[*]The Honorable William H. Stafford, Jr., United States District Judge
for the Northern District of Florida, sitting by designation.

1

————————————

**COUNSEL**

**ARGUED:**  Arlene F. Woods, Detroit, Michigan, Ellen Dennis, Saline, Michigan, Christopher J. Pagan, REPPER, POWERS & PAGAN, Middletown, Ohio, for Appellants. Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** Arlene F. Woods, Raymond R. Burkett, Detroit, Michigan, Ellen Dennis, Saline, Michigan, Timothy P. Murphy, St. Clair Shores, Michigan, for Appellants.  Patricia G. Gaedeke, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

————————————

**OPINION**

————————————

SILER, Circuit Judge.  Defendants Joseph Rovess Stines, Durand Chaunce Ford, Keith Maurice Phelan and Kenneth Andrew Jefferson challenge, on a wide variety of grounds, their convictions and sentences following a jury trial in the district court.  All four defendants were found guilty of conspiring to distribute and to possess with intent to distribute cocaine and cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and 846.  For the reasons that follow, we affirm the district court.

Because resolution of defendants' sentencing issues concerning the application of the rule from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, in particular, *United States v. Cotton*, 122 S. Ct. 1781 (2002), may have precedential value, those issues will be addressed below. The remaining issues raised by defendants are addressed in an unpublished appendix to this opinion.

In providing for graduated penalties in 21 U.S.C. §§ 841(b), Congress intended that defendants, like respondents, involved in large-scale drug operations receive more severe punishment than those committing drug offenses involving lesser quantities. Indeed, the fairness and integrity of the criminal justice system depends on meting out to those inflicting the greatest harm on society the most severe punishments. The real threat then to the "fairness, integrity, and public reputation of judicial proceedings" would be if respondents, despite the overwhelming and uncontroverted evidence that they were involved in a vast drug conspiracy, were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial.

*Id*. at 1787.

Following the opinion in *Cotton*, we find that the defendants' forfeiture of their *Apprendi* objections below precludes a finding of plain error by this court.  There was an overwhelming amount of evidence to justify the district court's drug quantity determinations.  Trial testimony established that Stines was buying two to five kilograms of crack a week from his source in Detroit as early as 1993. There was also testimony that Ford was Stines's right hand man at least from 1996 on.  Each of the cooperating conspirators had personally purchased more than a kilogram of crack from Stines and other members of the gang.  Thus, the district court's determination as to drug quantities attributable to Stines and Ford, based on this overwhelming amount of evidence, after the decision in *Cotton*, does not constitute plain error.  Accordingly, we affirm Stines's and Ford's sentences.

AFFIRMED.

Under the plain error test of Fed. R. Crim. P. 52(b), there must be (1) error, (2) that is plain, and (3) that affects defendants' substantial rights. *See Cotton*, 122 S. Ct. at 1785. "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if . . . the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks and citations omitted).

In *Cotton,* the Supreme Court applied the plain error analysis to facts almost identical to those in this case. The indictment in *Cotton* charged a conspiracy to distribute and possess with intent to distribute a "detectable amount" of cocaine and cocaine base. *Id.* at 1783. The district court imposed sentences well beyond the twenty-year statutory maximum for drug offenses involving a detectable quantity of cocaine or cocaine base. Consistent with the practice in federal courts at that time, at sentencing the district court made a finding of drug quantity that implicated the enhanced penalties of § 841(b)(1)(A). *See id.* Based on the subsequent ruling in *Apprendi*, the government conceded that the indictment's failure to allege a fact, drug quantity, that increased the statutory maximum sentence rendered the sentences erroneous. The government also conceded that the error was plain. *See id.* at 1785. The only issue left for the Court to decide was whether the plain error affected the defendants' substantial rights. The Court concluded it did not need to determine whether this element of the plain error inquiry was satisfied because even assuming defendants' substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. *See id.* It found the evidence that the conspiracy involved at least 50 grams of cocaine base "overwhelming" and "essentially uncontroverted" and, thus, there was no basis for concluding that the error would seriously affect the fairness of the judicial proceeding. *See id.* The Court explained:

## Background

The voluminous testimony and other evidence introduced at trial established the following facts. In the late 1980's Joseph Stines organized a gang in Ypsilanti, Michigan, to "distribute crack cocaine and make money." The initial members included Keith Phelan, Tever Scarbrough, Reese Palmer, Rasual Warren, Hans Thomas and Stanley Anderson. Stines and Palmer learned to measure, package and "rock up" crack cocaine in 1989. Together with Hans Thomas, they obtained large quantities of cocaine from LaBaron Hunter and other sources in Detroit and brought it back to Ypsilanti to be processed and distributed.

During the early years, Stines sold directly to customers, sometimes out of a parked car. Stines was arrested in June 1989 for selling crack on the street. By 1993, Stines considered himself a "drug kingpin," and he divided up and assigned territory to other members.

In May 1995, Oscar Little, an acquaintance of Stines, agreed to cooperate with the police. Little purchased one ounce of crack directly from Stines at an apartment on Elmwood. The purchase and other information supplied by Little provided probable cause to search the apartment on Elmwood and Stines's apartment on Spinnacker Way. Stines and Phelan, along with other gang members, were present when the Spinnacker Way apartment was searched. No measurable amount of cocaine was recovered but police recovered $680 in recorded currency from the sale to Little and a bowl containing cocaine residue, filter masks and an assault rifle. Stines was arrested after the search and he offered to cooperate with the police. He told Lieutenant Donald Bailey that he was buying ten to fifteen kilograms of cocaine from LaBaron Hunter every couple of weeks. Bailey released Stines, hoping to use him to investigate Hunter, but Stines did not cooperate.

Rasual Warren, one of the original gang members, was released from a rehabilitation program in July 1996. Phelan directed Warren to JJ's Car Wash when he asked about Stines. Stines introduced Durand Ford as his "right hand man" and Phelan as his "enforcer." Initially, Stines said that he wasn't in the drug business any more, then said he still sells but "keeps it in the Stone Life [gang] circle." Stines assigned Warren to sell crack on Grove Street, but he was later moved to make room for Palmer. Warren accompanied Stines to a house on Calder Street that belonged to Ford's grandmother. Stines retrieved two ounces of crack from the house. After Warren was arrested in 1996, Stines moved the cocaine and some guns from the house on Calder, but he told Palmer that he left one gun behind so that Ford would have protection. Based on information from Warren, police searched the house on Calder and found one handgun in the bedroom that appeared to be occupied by Ford.

After Palmer was released from prison in September 1996, he chose Grove Street as his territory. One of his customers was a white male called "Eric," an undercover police officer. Palmer made several sales to Eric in October and November 1996. Palmer was arrested based on those sales. He agreed to cooperate with the police and taped a conversation with Stines during which Stines talked about tactics to evade police by revealing that he did not "go outside the circle," and he had Ford deal with everyone else. After Palmer bought crack from him, Stines left in a car driven by Ford.

Police managed to make a series of undercover crack purchases from Scarbrough in July 1997. Scarbrough arrived for the third meeting in a car registered to Kenneth Jefferson. After Scarbrough was arrested, he allowed police to record a conversation with Stines that provided police with Stines's Doral Street address. Scarbrough also bought an ounce of crack from Stines while police surveilled from a distance. Two days later, Scarbrough met Stines outside a store to pay for the crack. While they talked in the car, Phelan took some other men who had accompanied them into the store.

quantity determination in response to their presentence reports. In order to preserve an *Apprendi* challenge, the defendants need not "utter the words 'due process'" as long as it is well known that they dispute the district court's factual findings as to drug quantity. *United States v. Strayhorn*, 250 F.3d at 462, 467 (6th Cir. 2001) ("Contrary to the government's assertions that [the defendant's] constitutional challenge was waived, we believe the record makes plain that [the defendant] preserved his challenge by repeatedly objecting to the drug quantity determination at his plea hearing and at his sentencing hearing, as well as in a written objection to the calculation of his base offense level in his presentence report.").

At sentencing, however, Stines withdrew his objection and Ford stipulated to a base offense level of 38. The subsequent withdrawal by Stines and stipulation by Ford could lead one to believe that defendants waived their claims challenging the drug quantity determination. "Waiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks and citation omitted). The significance of this difference is that plain error does not apply to cases of waiver, but may be invoked in the court's discretion to review rights that were forfeited below. *See id.* 733-34. It would have been impossible for the defendants to have intentionally relinquished or abandoned their *Apprendi* based claims considering *Apprendi* was decided after they were sentenced. Thus, we find that Stines's withdrawal and Ford's stipulation resulted in a forfeiture of their right to challenge the drug quantity determination on appeal, requiring us to review their *Apprendi* claims under a plain error analysis. *See United States v. Wade*, 266 F.3d 574, 585 (6th Cir. 2001) ("Generally, a failure to object at sentencing forfeits any challenge to the sentence on appeal. We may overlook such a forfeiture to correct a plain error.").

that he used a weapon during and in furtherance of the conspiracy, under *Apprendi*, his sentence is a violation of his Fifth and Sixth Amendment rights and must be vacated and remanded for resentencing. Stines makes the same argument, adding that the issue concerning his leadership role should have been submitted to the jury and proved beyond a reasonable doubt.

Ford received a sentence based on the district court's finding of drug quantity, approximately 25 kilograms of cocaine base, that implicated the enhancement penalties of 21 U.S.C. § 841(b)(1)(A), which prescribe a term of imprisonment up to life. He also received a two-level enhancement for possession of a weapon in furtherance of the conspiracy. His sentence of 292 months was well beyond the statutory maximum of twenty years for an unspecified quantity of any form of cocaine pursuant to § 841(b)(1)(C). The district court found that Stines was accountable for 25 kilograms to 100 kilograms of cocaine base, implicating the enhancement penalties under § 841(b)(1)(A). He also received a four-level enhancement for his leadership role in the conspiracy. Stines's sentence, 400 months, was also well beyond the statutory maximum of twenty years.

Ford argues that the indictment was defective because it failed to allege an element of the offense, i.e., drug quantity. Although he did not move to dismiss the indictment on this ground, Ford claims that this is a jurisdictional objection that may be raised at any time. In *United States v. Cotton*, 122 S. Ct. 1781, 1785 (2002), the Supreme Court explained that it had some time ago abandoned the view that indictment defects are jurisdictional. Thus, Ford's claim that a defective indictment deprives a court of jurisdiction requiring dismissal must be rejected.

Next, we must determine the appropriate standard of review to apply in evaluating defendants' *Apprendi* challenge. Although Ford and Stines did not raise the issue of quantity at trial, it is clear that they made written objections to the drug

Later that same year, Jefferson sold Labron Nunn two and a half ounces of crack. Jefferson obtained the crack for the sale from Anita Hargrove's home, where he was staying. Hargrove was Stines's girlfriend and he used her apartment as a "stash house." Jefferson asked Nunn to join "the family," but Nunn declined.

In 1999, Stines, Ford, Phelan, Jefferson, Antonio James, David Bowles and Aaron Bowles were indicted on one count of conspiracy to distribute and to possess with intent to distribute cocaine and cocaine base. When Jefferson was subsequently arrested, he admitted that he had started selling crack in Ypsilanti in the summer of 1996. He said that Scarbrough was one of his principal suppliers and that he often bought one-eighth of a kilogram, but on two occasions he had purchased a half kilogram.

All seven defendants were tried and found guilty. The three defendants who are not parties to this appeal cooperated with the government in return for sentence reductions.

As the trial occurred before the decision in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the jury was not called upon to determine drug quantity or type. The court sentenced Stines to a term of 400 months and Ford to 292 months, both prior to the decision in *Apprendi*. The district court determined, post *Apprendi*, that the sentences imposed on Phelan and Jefferson could not exceed 240 months, the statutory maximum penalty for an unspecified amount of cocaine and cocaine base.

### Discussion

The conspiracy alleged in the indictment did not specify the quantity of the cocaine and cocaine base. The parties did not ask for special findings, so the jury's verdict established only that the conspirators were liable for an unspecified quantity of cocaine and cocaine base.

## A.   *Apprendi Claim (Jefferson and Phelan)*

Jefferson and Phelan both argue that the district court's failure to submit the drug type and quantity determination to the jury violates their constitutional rights in light of *Apprendi*. The Supreme Court held that "[o]ther than the fact of a prior conviction, *any fact that increases the penalty for a crime beyond the prescribed statutory maximum* must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490 (emphasis added). Because the district court limited the defendants' sentences to twenty years, and the statutory maximum penalty for an unspecified quantity of any form of cocaine is twenty years, *see* 21 U.S.C. § 841(b)(1)(C), the *Apprendi* ruling is not triggered and does not impact the sentence for either Jefferson or Phelan. *See, e.g., United States v. Stafford*, 258 F.3d 465, 478-79 (6th Cir. 2001) ("[A] violation of the principles set forth in *Apprendi* rises to the level of 'plain error' only where the defendant's sentence exceeds the maximum possible sentence that could be imposed by statute *absent* the offending 'sentencing factor' determined under the too-lenient 'preponderance' standard. . . . [E]ven if a determination of a particular drug quantity is improperly made under the 'preponderance' standard, there is no plain error in a sentence that lies within the applicable statutory sentencing range for the same offense involving an indeterminate amount of drugs.").

Defendants urge us to expand our application of *Apprendi* to disapprove of the imposition of a mandatory guideline minimum sentence unless a jury has made findings beyond a reasonable doubt as to the facts necessary to establish that guideline minimum. To support this argument, they rely on *United States v. Ramirez*, 242 F.3d 348, 351 (6th Cir. 2001), which held that *Apprendi* was applicable when a defendant's penalty was increased from "a nonmandatory minimum sentence to a mandatory minimum sentence, or from a lesser to a greater minimum sentence." Defendants claim that the logical extension of this decision would be to apply *Apprendi* to mandatory minimum sentences imposed under the sentencing guidelines even where the statutory maximum is not exceeded.

This contention is meritless in light of the recent decision in *Harris v. United States*, 122 S. Ct. 2406 (2002), and we question whether *Ramirez* is still good law after that decision. According to the majority in *Harris*,

> [w]hether chosen by the judge or the legislature, the facts guiding judicial discretion *below the statutory maximum* need not be alleged in the indictment, submitted to the jury, or proved beyond a reasonable doubt. When a judge sentences the defendant to a mandatory minimum, no less than when the judge chooses a sentence within the range, the grand and petit juries already have found all the facts necessary to authorize the Government to impose the sentence. The judge may impose the minimum, the maximum, or any other sentence within the range without seeking further authorization from those juries--and without contradicting *Apprendi*.

*Id.* at 2418 (emphasis added). Although it is true that the quantity determined by the district court elevated the mandatory guideline minimum sentence, *Harris* tells us that *Apprendi* does not invalidate that increase. *See id*; *see also United States v. Schulte*, 264 F.3d 656, 660 (6th Cir. 2001) (rejecting contention that *Apprendi* should apply to guideline enhancements even where the statutory maximum is not exceeded).

Contrary to defendants' arguments, their respective sentences do not trigger *Apprendi* because the drug type and quantity attributed to them does not affect the statutory maximum. Accordingly, we reject their argument proposing an extension of *Apprendi* and affirm their sentences.

## B.   *Apprendi Claim  (Stines and Ford)*

Ford argues that because the jury was not required to find either the type or quantity of drugs involved in the offense or